[Cite as *State v. Perrien*, 2020-Ohio-798.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                             No. 108339

    v.                            :

DENNIS W. PERRIEN, JR.,                 :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 5, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-626337-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Theodore Parran, III, and Anna M. Faraglia, Assistant Prosecuting Attorneys, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Paul Kuzmins, Assistant Public Defender, *for appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, Dennis Perrien, Jr. ("appellant"), brings the instant appeal challenging his convictions for reckless homicide and felonious assault. Appellant argues that he was denied his constitutional right to the effective

assistance of counsel, his convictions are not supported by sufficient evidence and against the manifest weight of the evidence, the trial court committed plain error by failing to provide a jury instruction on the offense of negligent homicide, and he was denied his constitutional right to a fair trial. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} The instant appeal pertains to a shooting that occurred on February 23, 2018, in a warehouse of an industrial park on Cleveland's west side. Appellant, victim Donald Van Horn III (hereinafter "victim"), and Jerrold Saxton met at the warehouse, which they planned to remodel into a clubhouse for their motorcycle club, the All American Men of Honor Motorcycle Club. The purpose of the February 23 meeting was to assess the progress of the remodeling and sign the lease that had been drawn up by the owner, Scott Landry.

{¶ 3} Appellant discharged a single round from his 9 mm Ruger SR9c handgun. A primary issue in this appeal is whether the shot was discharged recklessly or negligently. The shot struck the victim from a distance of approximately one to three feet. Appellant immediately began performing life saving measures and emergency personnel were contacted. The victim ultimately succumbed to the gunshot wound, and was pronounced dead at the scene at approximately 10:00 a.m.

{¶ 4} There were no eyewitnesses to the shooting that could testify about the specific circumstances under which the shot was fired from appellant's gun.

Appellant advised the responding officers that he accidentally shot the victim and that he was joking around with the victim at the time the gun discharged. Appellant explained that he and the victim would often joke around with one another, during which the victim would pull his switchblade knife and appellant would pull his gun.

{¶ 5} Appellant was arrested for his involvement in the shooting on February 23, 2018. On March 22, 2018, the Cuyahoga County Grand Jury returned a two-count indictment charging appellant with (1) murder, in violation of R.C. 2903.02(B), and (2) felonious assault, in violation of R.C. 2903.11(A)(1). Both counts contained one- and three-year firearm specifications. The murder offense charged in Count 1 alleged that appellant caused the death of the victim as a proximate result of committing or attempting to commit felonious assault, an offense of violence. Appellant pled not guilty to the indictment during his arraignment on March 27, 2018.

{¶ 6} On January 7, 2019, the state filed a brief "regarding lesser included offenses." Therein, the state argued that reckless homicide, in violation of R.C. 2903.041(A), is a lesser-included offense of homicide, in violation of R.C. 2903.02(B), and that negligent homicide, in violation of R.C. 2903.05(A), is not a lesser-included offense of homicide. Accordingly, the state maintained that negligent homicide "cannot be considered as a possible legal theory for jury instructions in this matter."

{¶ 7} A jury trial commenced on January 8, 2019. At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal. The trial court

denied defense counsel's motion. The defense did not call any witnesses. Defense counsel renewed the Crim.R. 29 motion after resting, and the trial court denied the renewed motion.

{¶ 8} On January 16, 2019, the state filed a brief regarding "jury instructions pertaining to accident." Therein, the state argued that a jury instruction on accident was not proper because the state did not bear the burden of demonstrating that appellant acted purposefully, rather, the state had to demonstrate that appellant acted knowingly. The state contended that an accident instruction was only appropriate and warranted when a defendant is alleged to have engaged in purposeful conduct.

{¶ 9} The trial court instructed the jury on January 16, 2019. The trial court provided jury instructions on the murder offense charged in Count 1, the felonious assault offense charged in Count 2, including the mental state of knowingly, the lesser-included offense on Count 1 of reckless homicide, including the mental state of recklessly, and the defense of accident. On January 18, 2019, the jury returned its verdict. The jury found appellant guilty on Count 1 of the lesser-included offense of reckless homicide, a third-degree felony in violation of R.C. 2903.041(A), and guilty of the underlying one- and three-year firearm specifications. The jury found appellant not guilty on Count 2.

{¶ 10} The trial court held a sentencing hearing on February 26, 2019. The trial court sentenced appellant to a prison term of four years: three years on the

firearm specification to be served prior and consecutive to one year on the reckless homicide conviction.

{¶ 11} On March 22, 2019, appellant filed the instant appeal challenging the trial court's judgment. He assigns six errors for review:

> I. Trial counsel was ineffective for failing to request a jury instruction on negligent assault.
>
> II. The trial court committed plain error when it failed to instruct the jurors on the offense of negligent homicide.
>
> III. Appellant's conviction for reckless homicide is not supported by sufficient evidence where the evidence only supports a finding of negligence.
>
> IV. Appellant's conviction for reckless homicide is against the manifest weight of the evidence.
>
> V. [Appellant] was denied a fair trial when he was not permitted to present evidence about the existence of the charge of negligent homicide even if a jury instruction was not forthcoming.
>
> VI. Trial counsel was ineffective for asking a question of the victim's widow [to which] counsel did not know the answer and that no trial tactic would justify.

For ease of discussion, we will address appellant's assignments of error out of order.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight

{¶ 12} In his third assignment of error, appellant argues that his conviction for reckless homicide was not supported by sufficient evidence. Specifically, appellant contends that the state failed to demonstrate the element of recklessness. In his fourth assignment of error, appellant argues that his conviction for reckless homicide is against the manifest weight of the evidence because the weight of the

evidence demonstrated that he committed the offense of negligent homicide, not reckless homicide. Because these issues are closely related, we will address them together.

{¶ 13} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 14} In contrast to sufficiency of the evidence, weight of the evidence involves the inclination of the greater amount of credible evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} Appellant was convicted of reckless homicide, a third-degree felony in violation of R.C. 2903.041(A), which provides that "[n]o person shall recklessly cause the death of another[.]"

{¶ 16} The culpable mental state of "recklessness" is defined in R.C. 2901.22(C) as follows:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 17} "Substantial risk" is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."

{¶ 18} In the instant matter, appellant argues that he acted "instinctively, impulsively, [and] without active considerations of the underlying risk." Appellant's brief at 20. Appellant also contends that he did not have enough time to contemplate and disregard a known risk. Appellant maintains that the evidence presented at trial was indicative of negligence, not recklessness. We disagree.

{¶ 19} As an initial matter, we note that the state's case was based almost entirely on circumstantial evidence, which has the same probative value as direct evidence. *See Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. There were no

eyewitnesses to the shooting that could testify about the specific circumstances under which the shot was fired from appellant's gun (i.e. whether appellant and victim were wrestling with gun and it went off accidentally; whether the victim jokingly lunged at appellant with his knife and appellant reacted by drawing his gun; whether the victim had, in fact, drawn his knife and whether the blade was open, etc.). The only individual present inside the warehouse with appellant and the victim at the time of the shooting was Jerrold Saxton. However, his back was turned to the victim and appellant, and as a result, he did not see the specific circumstances under which the shot was fired. Two other witnesses, Kimberly Shaffer and Ann Marquard, were working in the office next door to the clubhouse in which the shot was fired. They did not see the specific circumstances under which the shot was fired.

{¶ 20} Saxton testified that he was friends with both appellant and the victim. On the day of the shooting, he walked through the perspective warehouse with appellant and the victim. As the three walked through the space to assess the progress of the renovations, he noticed some paint that was "overspray[ed]" on a wall. (Tr. 1038.) Saxton made a comment to appellant and the victim about his observation. The three were joking around with one another about the overspray. Saxton explained that the victim asked who was responsible for the overspray. When Saxton said that he did not know who was responsible, the victim "made a joking gesture * * * pointing at [appellant]." (Tr. 1039.)

{¶ 21} Appellant and the victim continued to "bust each other's balls" about the overspray, and they both said they were doing the best they could with the renovations. (Tr. 1042.) Saxton walked away from appellant and the victim to put his soda down. The victim and appellant were still talking, but Saxton was not paying attention to the specific nature of their conversation. At this point, Saxton heard a "loud pop," turned around, and saw the victim stumble backwards one or two feet. (Tr. 1042.) He initially thought the victim was joking around, but then observed blood coming from the victim's chest. Appellant began to yell, "I didn't mean it. It was an accident." (Tr. 1043.) Saxton saw a knife and a gun on the ground near the victim.

{¶ 22} Saxton called 911. Although he could not remember exactly what he said to the operator, he opined at trial that he said he "needed to report a shooting, an accident." (Tr. 1045.) The 911 call was played at trial, and Saxton did not mention the shooting was an accident during the recorded call.

{¶ 23} As noted above, Saxton testified that appellant and the victim were joking around with one another about the paint overspray. He did not hear either appellant or the victim raise their voice. Because his back was turned to appellant and the victim, he did not see a gun or a knife pulled when appellant and the victim were talking about the overspray.

{¶ 24} When Saxton spoke with first responders at the scene, he told them that the victim was accidentally shot. Saxton explained that he did not know for certain whether the victim was accidentally shot, but he was speculating that it was

an accident because he knows appellant and the victim, and Saxton did not have any reason to think that the shooting was intentional. Saxton was assuming that the shooting was an accident "because I know both of them and I know that neither one of them have ever done anything to each other to try to harm each other." (Tr. 1064.)

{¶ 25} On cross-examination, Saxton testified that he had never seen appellant and victim argue or get violent with each other. He knew the victim to carry a "[s]pring-action" knife, commonly known as a "switchblade." (Tr. 1085.) This is the type of knife he saw on the ground near the victim's body. Saxton testified that the victim would occasionally mess around with his knife: "when [victim] would joke around, he'd pull it out and pop it open and say, I cut you, and then he'd close it and put it away." (Tr. 1085.) Saxton explained that "most of us never really took [the victim's joking around] seriously," and the victim never actually cut anybody.

{¶ 26} When Saxton walked away from appellant and the victim, he could not hear exactly what they were saying to one another as they were "pulling each other's chain" about the paint overspray. (Tr. 1092.) Saxton never heard the victim pull out his knife and say he was going to cut appellant, and he never heard appellant pull his gun out or make any reference to a gun or a knife. When Saxton turned around after hearing the loud pop, he did not see a gun in appellant's hand and he did not see a knife in the victim's hand.

{¶ 27} Saxton testified that when Kimberly Shaffer, an employee of the victim's company, came running into the warehouse where the shooting took place, he did not say that the shooting was an accident. However, Saxton confirmed that

he has told people that the shooting was an accident "[e]very chance I can get." (Tr. 1105.)

{¶ 28} Although it did not bother him when he saw the victim playing or joking around with his knife in the past, Saxton testified that it would have concerned him if he saw appellant pull out a loaded gun in a joking manner. Saxton explained that his concern would not be that appellant would shoot the gun, but "a loaded gun it, to me, in my eyes, is much more dangerous than a knife." (Tr. 1114.)

{¶ 29} Kimberly Shaffer testified that she was working for the victim's heating and cooling company, BTU Comfort Solutions, at the time of the shooting. Her office was next door to the space that appellant, the victim, and Saxton were renovating to use as a clubhouse for their motorcycle club. Shaffer testified that when people were conversing in the clubhouse, she could not hear them. However, when the people in the clubhouse were yelling, she was able to hear them. Shaffer testified that she did not hear any yelling or arguing in the clubhouse before she heard the loud noise that she later learned was a gunshot.

{¶ 30} After hearing the loud noise and subsequent commotion, Shaffer ran from her office into the clubhouse. She saw the victim lying on the ground, and appellant was kneeling next to him with his hands on the victim's chest. Shaffer testified that there was a knife that was on the ground near appellant and the victim. The knife was closed. Shaffer told appellant to grab the knife and cut victim's shirt open so they could see where the blood was coming from. Shaffer confirmed that the knife was closed, and that appellant opened the knife.

{¶ 31} On cross-examination, Shaffer explained that she did not notice the knife and gun on the ground immediately when she ran from her office into the clubhouse. She noticed the knife on the ground next to the victim when she knelt down and began talking to him.

{¶ 32} Shaffer testified that she did not observe anything that led her to believe that there was a struggle or a fight between appellant and the victim. She did not observe any injuries that appellant had sustained.

{¶ 33} When police arrived on the scene, Shaffer told officers she thought the shooting was an accident. (Tr. 895.) Shaffer explained that appellant and the victim were best friends. Shaffer told several people that the victim had been accidentally shot, including another member of the motorcycle club, Saxton's girlfriend, and appellant's brother. Finally, Shaffer believed that she told Cleveland Police Detective Kevin Fischbach ("Det. Fischbach") that the shooting was an accident.

{¶ 34} Ann Marquard was also an employee of the victim's company. She testified that when people were in the clubhouse, she could hear them when they were talking, yelling, and using power tools. (Tr. 921.) On the day of the shooting, she heard "yelling as far as calling [911], don't die on me." (Tr. 922.) She walked from her office to the clubhouse and saw the victim laying on the floor, appellant standing over the victim, and Shaffer applying pressure to the victim's gunshot wound. She did not hear any yelling or screaming coming from the clubhouse before she heard someone yell to call 911.

{¶ 35} The victim's wife, Krista Van Horn (hereinafter "widow"), testified that she came to the scene after the shooting and asked appellant what happened. Appellant indicated to her that the shooting was an accident. (Tr. 954.) She did not believe that she had ever said that the shooting was an accident.

{¶ 36} Sergeant Michael Rybarczyk ("Sgt. Rybarczyk"), a 30-year veteran of the Cleveland Police Department, was the first officer to arrive on the scene. He heard appellant on the phone speaking to his mother and appellant said that "he shot [the victim]; that it was an accident; they were screwing around and like they always do; and [the victim] pulled a knife, I pulled my gun, and I accidentally shot him." (Tr. 700.) In addition to telling this to his mother, appellant provided the same information about the shooting to Sgt. Rybarczyk.

{¶ 37} On cross-examination, Sgt. Rybarczyk explained that appellant blurted out that he shot the victim accidentally. (Tr. 777.) He authored a report documenting appellant's statement that he shot the victim, they were fooling around like they always do, the victim pulled out a knife, appellant pulled out his gun, and appellant accidentally shot the victim. (Tr. 778.)

{¶ 38} Sgt. Rybarczyk testified that he did not observe anything apparent indicating that a struggle had taken place. Appellant directed Sgt. Rybarczyk to his gun that was on the ground. Sgt. Rybarczyk observed a knife on the ground next to the gun. He could not recall whether the knife was open.

{¶ 39} Sgt. Rybarczyk told the other officers on the scene that the shooting appeared to be "pretty cut and dry[.]" (Tr. 781.) He explained that his "cut and dry"

statement was referring to the fact that he had identified the shooter and he was not looking for other suspects, rather than referring to the fact that the shooting was or was not an accident. (Tr. 782.) Finally, Sgt. Rybarczyk confirmed that when he was on the scene, he had no opinion about whether this was an accidental or a purposeful shooting.

{¶ 40} Det. Fischbach testified that when he arrived on the scene with his partner, they spoke with Sgt. Rybarczyk about what had transpired. The victim was laying on the ground on his back, and his hands were off to his side. Det. Fischbach observed a knife on the ground close to the victim's head. He described the knife as a "work knife." (Tr. 1585.) He confirmed that the knife's blade was in the open position when it was observed and collected by police.

{¶ 41} Det. Fischbach testified about appellant's holster. He opined that appellant had the holster for a while. He explained that the holster has "a release snap on top where you would use to cover the top end of the handgun." (Tr. 1591.) The state introduced exhibit No. 25 at trial, which was a photograph of appellant's holster. Appellant's holster connected to his pants belt, and the holster was worn underneath appellant's brown jacket. (Tr. 1593.)

{¶ 42} On cross-examination, Det. Fischbach acknowledged that the body camera footage captured by Sgt. Rybarczyk shows appellant saying that he and the victim were screwing around, and that the shooting was an accident. During an interview of Saxton, Det. Fischbach learned that the victim would often play with his knife. Det. Fischbach opined that "playful" was not the proper term to describe the

conduct of 50-year-old adults in relation to a murder. He felt that "joking" was more appropriate to describe the conduct of adults than "playful."

{¶ 43} Det. Fischbach testified that he did not learn anything more about why this homicide occurred, such as a potential motive, after conducting his investigation. Det. Fischbach confirmed that when he conducts an investigation, he presents the facts to the prosecutor and the prosecutor determines what charges to pursue.

{¶ 44} Finally, Det. Fischbach explained that appellant did not assert to him that the shooting was an accident. Even if appellant had, Det. Fischbach's inquiry in this case and in other investigations would not stop merely because someone says it was an accident.

{¶ 45} Roger Polk, an Ohio CCW instructor and United States Marine Corps. Veteran, testified that appellant completed his CCW course in 2013. Polk explained that basic military firearms training involves rifles, not handguns. (Tr. 1223.) Basic training consists of 13 weeks, two of which are spent on the shooting range. (Tr. 1234.)

{¶ 46} In the military, there are basic "principles and fundamentals" of firearm safety. (Tr. 1230.) These safety principles and fundamentals are "constantly" drilled into your head during basic training. (Tr. 1231.) Polk described the principles and fundamentals: "you keep the muzzle pointed in a safe direction; you keep your finger off the trigger until you're ready to shoot; and you don't load it until you're instructed to load the gun." (Tr. 1230-1231.) Polk testified that these

three principles and fundamentals of gun safety apply regardless of what branch of the military a person serves.

{¶ 47} Polk emphasizes the same principles of gun safety in his CCW course: (1) the gun should be unloaded if you are not using it, (2) always keep the gun pointed in a safe direction, and (3) keep your finger off the trigger. (Tr. 1187-1190.) Polk opined that an accidental discharge of a firearm typically results when a person has their finger on the trigger before they are ready to shoot. (Tr. 1224.)

{¶ 48} Polk's testimony demonstrates that appellant would have been taught the three principles and fundamentals of gun safety — both in his military basic training and during Polk's CCW course.

{¶ 49} James Kooser, a firearms examiner with the Cuyahoga County Regional Forensic Science Laboratory, testified that appellant's gun was a Ruger SR9c, 9 mm. He performed a trigger pull test and found that it had a trigger pull of "five and three quarters to six pounds." (Tr. 1260.) Kooser explained that trigger pull is the amount of pressure it takes on the trigger to have the gun fire.

{¶ 50} Kooser confirmed that appellant's firearm was operable and functioned normally. Kooser did not find any malfunctions or anything wrong with appellant's gun during his examination.

{¶ 51} Cleveland Police Sergeant Michael Quinn ("Sgt. Quinn"), assigned to the Homicide Unit, testified that Sgt. Rybarczyk told him that appellant said the victim was his friend, they were fooling around, the victim had a knife, appellant had a gun, and appellant shot him. Sgt. Quinn explained that the victim's wife was

confused about what had transpired and wanted to speak with appellant. Sgt. Quinn did not remember the exact conversation between appellant and the victim's wife, but appellant put his head down and apologized.

{¶ 52} Sgt. Quinn testified that when he learns that something may have been an accident, he has an obligation to conduct an investigation with an open mind to see where it takes him. (Tr. 1468.)

{¶ 53} On cross-examination, Sgt. Quinn acknowledged that the synopsis in his report did not indicate appellant stated the shooting was an accident, nor does the report contain the word "accident." After watching the body camera footage obtained by Sgt. Rybarczyk, however, Sgt. Quinn confirmed that Sgt. Rybarczyk told him appellant stated this was an accident and that him and the victim were fooling around.

{¶ 54} Curtis Jones, from the Cuyahoga County Medical Examiner's Trace Evidence Unit, testified at trial that he performed a chemical trace metal detection test on the hands of the victim. Jones did not observe a reaction on the hands of the victim after performing this test. If a person handles exposed metal on an object, such as the handle of a gun or a knife, or a metal pipe, they may have a positive reaction on the trace metal detection test.

{¶ 55} On cross-examination, Jones acknowledged that a negative test result on the trace metal detection test does not conclusively establish that the person did not touch or handle a metal object. (Tr. 1302.) Jones received information that the

victim had potentially been in possession of a knife, but there was no indication whether the knife's handle was metal.

{¶ 56} Jones also performed gunshot residue testing in this case. He performed a chemical Griess test on the victim's sweatshirt that tests for gunpowder. This test indicated that the distance from the muzzle of appellant's gun to the victim was "intermediate," anywhere from one to three or four feet. (Tr. 1295.) Jones explained that the distance between the gun and the victim would not have been significantly less than one foot, otherwise there would have been the presence of "fouling," another type of gunshot residue.

{¶ 57} Dr. Thomas Gilson, Cuyahoga County's Medical Examiner, testified that appellant's gun was fired from an intermediate range, somewhere between 7 inches and 1.5 feet (18 inches).

{¶ 58} In support of his argument that the state failed to establish that he acted recklessly, appellant directs this court to *State v. Peck*, 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263 (10th Dist.), in which the Tenth Appellate District expounded on the definition of recklessness in determining the sufficiency of the evidence. In *Peck*, the defendant-appellant, a tow-truck driver, used a "snatch block," a large pulley with a hook attached, to pull a tractor trailer out of a median and tow the tractor. The pulley that Peck used to pull and tow the tractor trailer was not sufficiently rated to pull the tractor trailer's weight. The pulley broke, catapulted into a passing car, and the driver of a passing car was killed as a result of the incident. Peck was subsequently convicted of reckless homicide. *Id.* at ¶ 5.

**{¶ 59}** On appeal, the Tenth District reversed Peck's conviction for reckless homicide, concluding that the evidence did not establish that he knew the risk associated with his conduct because he was not aware that the equipment, the pulley, was not sufficiently rated to tow the tractor trailer. The appellate court held that "[a] mere failure to perceive or avoid a risk, because of a lack of due care, does not constitute reckless conduct." *Id.* at ¶ 12. In order to be convicted of recklessness, "one must recognize the risk of the conduct and proceed with a perverse disregard for that risk." *Id.* The court explained:

> In contrast to the actor who proceeds with knowledge of a risk, the failure of a person to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature is negligence. R.C. 2901.22(D). Recklessness requires more than ordinary negligent conduct. The difference between the terms "recklessly" and "negligently" is normally one of a kind, rather than of a degree. "Each actor creates a risk of harm. The reckless actor is aware of the risk and disregards it; the negligent actor is not aware of the risk but should have been aware of it." Wharton's Criminal Law, 15th Ed., Section 27, at 170 (emphasis sic); *see, also, State v. Wall* (S.D. 1992), 481 N.W.2d 259, 262.

*Id.* at ¶ 13.

**{¶ 60}** After reviewing the record, we find appellant's reliance on *Peck* to be misplaced. The evidence presented at trial demonstrates that appellant had his finger on or near the trigger of the loaded gun that he drew from his holster and pointed at or in the vicinity of the victim who was standing less than two feet away. Appellant does not argue that he thought the gun was unloaded, that he dropped the gun and it accidentally fired, or that he and the victim wrestled for the gun during

which it fired. He summarily argues that while he may have been negligent and careless, he was not reckless.

{¶ 61} The evidence in this case shows that appellant was aware of the risk of pointing a loaded gun at a target and having his finger on the trigger of the gun. These firearm safety principles and fundamentals were taught to appellant during his basic training in the military and Polk's CCW course. By removing his loaded gun from his holster, pointing his loaded gun at or in the vicinity of the victim, and placing his finger on the trigger of his loaded gun that was pointed at or in the vicinity of the victim, appellant disregarded all three of the principles and fundamentals of firearm safety.

{¶ 62} The facts of this case are more like the facts presented in *State v. Gough*, 5th Dist. Licking No. 08-CA-55, 2009-Ohio-322. In *Gough*, the defendant-appellant shot the victim in the head while playing with the victim's gun during a party at which appellant was drinking. The victim died of a gunshot wound to the head, and Gough was convicted of reckless homicide. *Id.* at ¶ 6, 11. The victim's gun was initially loaded, then it was unloaded by the owner, who loaded a bullet back into the gun after showing it to one of the party guests. *Id.* at ¶ 4.

{¶ 63} On appeal, Gough argued that his reckless homicide conviction was not supported by sufficient evidence because there was no evidence that he knew the gun had been reloaded and, as a result, the state did not demonstrate that he acted recklessly. The Fifth District rejected Gough's argument and affirmed his conviction, concluding that Gough knew the risks created by his conduct because

the gun owner usually kept the gun loaded, the gun had been loaded earlier in the evening, and Gough had previous experience with firearms. *Id.* at ¶ 21-23.

{¶ 64} In the instant matter, in reviewing the evidence in a light most favorable to the prosecution, as we must, we find the state presented sufficient evidence to find that appellant was aware of the risk when he drew his loaded gun, pointed it at or in the vicinity of the victim, and either had his finger on the trigger or failed to protect the trigger. Having completed basic training in the military, serving in the military, and completing Polk's CCW course, appellant had previous experience with firearms. Appellant's gun was loaded. There is no evidence that anyone other than appellant had possession and control of the gun on the day of the shooting.

{¶ 65} The evidence presented at trial demonstrated that appellant knew the risk created by his conduct. Appellant's act of drawing his loaded gun and pointing it at or in the vicinity of the victim who was standing less than two feet away, and placing his finger on the trigger of the gun that required minimal force to discharge demonstrated a perverse disregard of a known risk that the victim would be shot and killed.

{¶ 66} In *State v. Martin*, 10th Dist. Franklin No. 07AP-362, 2007-Ohio-7152, the defendant was convicted of reckless homicide after his girlfriend was fatally shot. The defendant alleged that the victim's gun discharged when he tried to take it away from her. *Id.* at ¶ 37. On appeal, the Tenth District held that the defendant's reckless homicide conviction was supported by sufficient evidence

where the defendant admitted that the gun had been in his hand when it discharged, and the state's evidence established that the shooting occurred while defendant and the victim were very close to one another and the state's firearms examiner testified that the only way that the gun could be fired is to apply pressure to the trigger. *Id.* at ¶ 63.

{¶ 67} In the instant matter, as noted above, the evidence established that the shooting occurred while appellant and the victim were less than two feet away from one another. There is no evidence that appellant and the victim struggled for the gun or that the gun was in the possession of anyone other than appellant. There is also no evidence that something other than appellant's finger caused the gun to discharge (i.e., dropping the gun and the gun firing upon hitting the floor, or bumping into an obstacle that came into contact with the trigger causing the gun to go off). The jury could have reasonably inferred that appellant drew his loaded weapon from his holster, pointed it at or in the vicinity of the victim, and had his finger on the trigger in a manner that applied enough pressure for the gun to discharge.

{¶ 68} Even if appellant did not have his finger on the trigger, the state's evidence sufficiently established that by pointing a loaded weapon at or in the vicinity of the victim who was standing less than two feet away, appellant perversely disregarded a known risk that his conduct was likely to cause harm. The Supreme Court of Ohio has recognized that "a firearm is an inherently dangerous

instrumentality, the use of which is reasonably likely to produce death" when fired at an individual. *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982).

{¶ 69} While appellant may not have intended to apply enough pressure to the trigger to fire a round from the gun, appellant's actions undoubtedly created a risk of harm to the victim, who was standing less than two feet away, and appellant perversely disregarded that risk by drawing his loaded gun from his holster, pointing it at or in the vicinity of the victim who was less than two feet away, and placing his finger on the trigger. *See State v. G.G.*, 10th Dist. Franklin No. 12AP-188, 2012-Ohio-5902, ¶ 14 ("A known risk of handling and manipulating a gun while standing in very close proximity to a child and while pointing it in the direction of that child, without checking the chamber to see if a bullet is still in the firearm, is that the firearm will discharge in the direction of the child, and the bullet will narrowly miss that child.").

{¶ 70} In *State v. Erby*, 2d Dist. Montgomery No. 27799, 2018-Ohio-3695, the Second District explained that "a defendant may be guilty of reckless homicide for *an unintentional shooting* if the evidence supports a finding that he handled a firearm in a reckless manner, resulting in another person's death." (Emphasis added.) *Id.* at ¶ 20, citing *State v. English*, 10th Dist. Franklin No. 13AP-88, 2014-Ohio-89, ¶ 13, and *State v. Howse*, 2012-Ohio-6106, 985 N.E.2d 246, ¶ 30-31 (9th Dist.). In *Howse*, the appellate court affirmed defendant's reckless homicide conviction where the defendant "cocked a loaded handgun and pointed it at" the victim, but did not intend to shoot the victim. *Id.* at ¶ 31. The evidence showed that

the defendant "was aware of the risks posed by firearms," and despite this awareness, "acted with heedless indifference to the consequences" of his own handling of a loaded weapon that discharged. *Id.* at ¶ 30-31.

{¶ 71} In the instant matter, given the evidence presented by the state at trial, the jury had a reasonable basis for finding that appellant acted recklessly by removing his loaded gun from his holster and pointing it at or in the vicinity of the victim who was less than two feet away from him. There is no evidence in the record indicating that appellant did not know the gun was loaded or that something other than appellant's finger caused the gun to discharge. Nevertheless, because appellant's gun discharged, the jury could have reasonably inferred that appellant's finger came into contact with the trigger, and applied enough force to cause the gun to discharge. Because appellant was a veteran and a CCW permit holder, the jury could have reasonably determined that appellant was aware of the risks posed by firearms, yet acted with heedless indifference to these consequences when he drew the loaded weapon and pointed it at or around the victim in the clubhouse.

{¶ 72} There is no evidence in the record that the bullet ricocheted off of anything before striking the victim. Therefore, the jury could have reasonably inferred that appellant pointed his loaded weapon directly at the victim.

{¶ 73} Kooser testified at trial that the amount of force required to discharge appellant's gun was 5.75 to 6 pounds. (Tr. 1260.) Polk opined that the force needed to discharge striker fire pistols, such as appellant's Ruger SR9c handgun, is "[m]uch, much lighter, dangerously so" than other handguns. (Tr. 1212.) To the extent that

appellant argues that the minimal amount of force required to fire his gun supports a finding that he did not act recklessly, we disagree. Unlike *Gough* and *Martin*, the gun that fired the shot in this case belonged to appellant. Appellant did not pick up a gun with which he was not familiar. Therefore, the jury could have reasonably inferred that appellant knew that a minimal amount of force was needed to pull the trigger and fire the weapon, and, therefore, it was reckless for appellant to have his finger on or around the trigger while he was "joking around" with the victim.

{¶ 74} Saxton appreciated the difference between joking around with a knife and joking around with a loaded gun. Although it did not bother him when he saw the victim playing or joking around with his knife in the past, Saxton testified that it would have concerned him if he saw appellant pull out a loaded gun in a joking manner. Saxton explained that his concern would not be that appellant would shoot the gun, but "a loaded gun is, to me, in my eyes, is much more dangerous than a knife." (Tr. 1114.) Saxton is not a veteran. Therefore, he did not complete the military basic firearms training during which the three principles and fundamentals of gun safety are emphasized. Nevertheless, Saxton's testimony indicates that with less training than appellant, Saxton is still cognizant of the inherent danger posed by firearms.

{¶ 75} The aforementioned circumstantial evidence demonstrates that appellant drew his loaded weapon from his holster, pointed it at the victim who was standing less than two feet away from him, and placed his finger on or near the trigger. Appellant's finger applied enough force to the trigger causing the gun to

discharge. The state's evidence, if believed, supports a finding that appellant handled his firearm in a reckless manner, and appellant's reckless conduct resulted in the victim's death. Therefore, although appellant and the victim may have been "joking around," and the shooting may have been unintentional, the evidence supports the jury's verdict.

{¶ 76} For all of the foregoing reasons, appellant's reckless homicide conviction is supported by sufficient evidence. Appellant's third assignment of error is overruled.

{¶ 77} Similarly, we find no basis upon which to conclude that appellant's reckless homicide conviction is against the manifest weight of the evidence. As an initial matter, to the extent that appellant argues that his conviction is against the manifest weight of the evidence because the evidence demonstrates that he committed the offense of negligent homicide rather than reckless homicide, appellant did not present this argument or proceed on this theory below. Rather, appellant defended against the charges on the theory that the shooting was accidental. Generally, a party cannot raise an argument for the first time on appeal that was not raised below. *See State v. Wintermeyer*, Slip Opinion No. 2019-Ohio-5156, ¶ 10.

{¶ 78} Appellant's manifest weight challenge is based on his argument that the jury erred by believing the state's version that appellant recklessly caused the death of the victim, rather than appellant's theory that appellant and the victim were joking around with one another, the shooting was accidental, and appellant did not

act recklessly. As noted above, the evidence presented at trial supports the conclusion that appellant recklessly caused the death of the victim.

{¶ 79} Appellant's reckless homicide conviction is not against the manifest weight of the evidence merely because the jury rejected the defense's theory that the shooting was an accident and found the state's version of the events to be more believable. "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 2. The jury did not lose its way in resolving the conflicting theories based on the evidence presented at trial.

{¶ 80} For all of the foregoing reasons, we are unable to determine that the jury clearly lost its way in finding appellant guilty of reckless homicide. Appellant's conviction is not against the manifest weight of the evidence. Appellant's fourth assignment of error is overruled.

## B. Negligent Homicide Instruction

{¶ 81} In his second assignment of error, appellant argues that the trial court committed plain error in failing to provide a negligent homicide instruction to the jury.

{¶ 82} Because appellant did not object to the trial court's jury instructions, we review for plain error. *See State v. Erker*, 8th Dist. Cuyahoga No. 107790, 2019-Ohio-3185, ¶ 147, citing *State v. Ruppart*, 187 Ohio App.3d 192, 2010-Ohio-1574,

931 N.E.2d 627, ¶ 8 (8th Dist.). In order to demonstrate plain error, appellant must

show that but for the error pertaining to the jury instructions, the outcome at trial

would have been different. *Ruppart* at *id.*

**{¶ 83}** The giving of jury instructions is within the sound discretion of the

trial court, and this court reviews the trial court's decision for an abuse of discretion.

*State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 42, citing *State*

*v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35, and *State v.*

*Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993).

> The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis. *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). The second tier looks to the evidence in a particular case and determines whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, [] ¶ 11. "Only in the second tier of the analysis do the facts of a particular case become relevant." *Deanda* at ¶ 6.
>
> In determining whether an offense is a lesser included offense of another, a court shall consider whether (1) "one offense carries a greater penalty than the other," (2) "some element of the greater offense is not required to prove commission of the lesser offense," and (3) "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *Evans* at paragraph two of the syllabus, clarifying *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988).
>
> After it has been determined that the offense is a lesser included offense, the second tier mandates that courts look to the evidence in a particular case and determine whether "'a jury could reasonably find

the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Deanda* at ¶ 6, quoting *Evans* at ¶ 13. *See also State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).

*State v. Becker*, 8th Dist. Cuyahoga No. 100524, 2014-Ohio-4565, ¶ 68-70.

{¶ 84} In the instant matter, appellant argues that the jury should have been instructed on the offense of negligent homicide, a first-degree misdemeanor in violation of R.C. 2903.05(A). R.C. 2903.05(A) provides that "[n]o person shall negligently cause the death of another * * * by means of a deadly weapon or dangerous ordnance as defined in section 2923.11 of the Revised Code."

{¶ 85} Appellant acknowledges that negligent homicide is "not always a lesser-included offense of reckless homicide." Appellant's brief at 16. Nevertheless, appellant argues that negligent homicide must be a lesser-included offense based on the facts of this case: "[a]nalyzing the mens rea of each offense it is obvious that negligent homicide must be a lesser included offense of felony murder and reckless homicide as the trial court instructed the jury in this case." Appellant's brief at 16.

{¶ 86} Appellant argues that the Ohio Supreme Court's holding in *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, should be extended to the offense of negligent homicide. In *Trimble*, the Ohio Supreme Court applied the three-part *Deem* test and concluded that reckless homicide is a lesser-included offense of aggravated felony murder:

> The first prong of the *Deem* test is met because reckless homicide is a felony of the third degree, which carries a lesser penalty than felony murder. The second prong is met because a defendant cannot cause the death of a person under R.C. 2903.01(B) without also causing the

death of that person under R.C. 2903.041. In purposely causing the death of another, one has to first become reckless in causing the death of another. Finally, the third prong is met because committing reckless homicide does not require the "committing or attempting to commit" another felony. R.C. 2903.01(B).

District courts of appeals have also held that reckless homicide is a lesser included offense of felony murder. *See State v. Anderson*, [12th Dist. Butler No. CA2005-06-156, 2006-Ohio-2714, ¶ 9] (reckless homicide as a lesser included offense of aggravated felony murder charged under R.C. 2903.01(B)); *State v. Alston*, [9th Dist. Lorain No. 05CA008769, 2006-Ohio-4152, ¶ 48] (reckless homicide as a lesser included offense of felony murder charged under R.C. 2903.02(B)).

*Trimble* at ¶ 190-191.

{¶ 87} In the instant matter, appellant argues that the *Trimble* rationale should be extended to the facts of this case. In *Trimble*, the Ohio Supreme Court explained that one cannot knowingly cause the victim's death as a proximate result of committing felonious assault without first becoming reckless in causing the death of another. In other words, in knowingly committing felonious assault which proximately causes the death of another, the defendant has to first become reckless in causing the death of another.

{¶ 88} Here, in arguing for an extension of *Trimble*, appellant appears to argue that one cannot knowingly or recklessly cause the victim's death without first becoming negligent in causing the victim's death. In other words, appellant contends that in knowingly committing felonious assault which proximately causes the death of another, or in recklessly causing the death of another, the defendant has to first become negligent in causing the death of another.

{¶ 89} Appellant points to no case law supporting his argument that negligent homicide is a lesser-included offense of either felony murder or reckless homicide or that the *Trimble* rationale should be extended to the offense of negligent homicide. In fact, appellant acknowledges that many of the cases from this court have held that negligent homicide is not a lesser-included offense of murder or reckless homicide. He contends, however, that these cases and the other cases from appellate districts in this state are "wrongly decided in relationship to the unique facts of this case." Appellant's brief at 16.

{¶ 90} In *State v. Jones*, 8th Dist. Cuyahoga No. 80737, 2002-Ohio-6045, the defendant-appellant was charged with murder in violation of R.C. 2903.02(B). On appeal, Jones argued that the trial court erred in failing to provide jury instructions on the offenses of reckless homicide and negligent homicide, which defense counsel had requested. *Id.* at ¶ 84.

{¶ 91} This court applied the three-part *Deem* test and held that the trial court did not err in failing to provide a negligent homicide instruction to the jury:

> In accordance with the definition set forth in *Deem, negligent homicide is not a lesser included offense of murder proscribed in R.C. 2903.02(B).* This is because this greater offense can be committed without the lesser offense, negligent homicide, also being committed. *Accord State v. Ford*[, 5th Dist. Stark No. 1999CA00177, 2000 Ohio App. LEXIS 3195 (July 10, 2000)] (negligent homicide is not a lesser included offense of murder as defined in R.C. 2903.02(B) because one can cause the death of another as a proximate result of committing or attempting to commit the proscribed felony by means other than by a deadly weapon or dangerous ordnance.)

(Emphasis added.) *Jones* at ¶ 93.

**{¶ 92}** On the other hand, this court held that reckless homicide is a lesser-included offense of murder:

> Regarding reckless homicide, we recognize it to be a lesser included offense. Here, an element of this murder statute, namely, commission of an underlying first or second degree felony, is not required to prove reckless homicide. However, we conclude an instruction on this lesser offense is nonetheless not warranted, because the jury could not have reasonably concluded that the evidence presented in this case supports a conviction for reckless homicide but not murder under R.C. 2903.02(B). *See Kidder*, [32 Ohio St.3d 279, 513 N.E.2d 311].

*Jones* at ¶ 94.

**{¶ 93}** In addition to this court's holding in *Jones*, the Supreme Court of Ohio has explicitly stated that "[n]egligent homicide is not a lesser included offense of murder." *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990), paragraph four of the syllabus. We decline to depart from this established precedent.

**{¶ 94}** After reviewing the record, we find no basis upon which to conclude that the trial court committed plain error in instructing the jury. Appellant was charged with murder and the trial court properly instructed the jury that the state had the burden of proving beyond a reasonable doubt every element of the offense, including the "purposely" mens rea.

**{¶ 95}** The trial court properly instructed the jury that if they did not find that the state met its burden on the elements of murder, it could then consider whether the state proved every element of the offense of reckless homicide, including the "recklessly" mens rea. The trial court also agreed to provide a jury instruction on the defense of accident, over the state's objection. (Tr. 1710.) These instructions

could easily allow the jury to understand that recklessness goes beyond what is considered to be an accident.

{¶ 96} For all of the foregoing reasons, we are unable to conclude that the trial court committed plain error by failing to provide a negligent homicide jury instruction. The offense of negligent homicide was not charged in the indictment, and is not a lesser-included offense of either murder or reckless homicide. Appellant's second assignment of error is overruled.

## C. Fair Trial

{¶ 97} In his fifth assignment of error, appellant argues that he was "denied a fair trial when he was not permitted to present evidence about the existence of the charge of negligent homicide even if a jury instruction was not forthcoming."

{¶ 98} Citing to a single question during cross-examination of Det. Fischbach, appellant asserts that defense counsel "sought to educate the jurors about the offense of negligent homicide[.]" Appellant's brief at 29. Defense counsel asked Det. Fischbach whether he "pitched [the incident] to the prosecutors as a negligent homicide[.]" (Tr. 1645.)

{¶ 99} Initially, the record reflects that the trial court sustained the state's objection to this question. Furthermore, when this single question is read in context with the other testimony presented at trial, it is evident that defense counsel was not trying to "educate" the jury about the offense of negligent homicide. Rather, defense counsel was trying to elicit testimony that supported the defense's theory that

although this was an accidental shooting, the police and prosecutors rushed to judgment by arresting appellant and charging him with murder.

{¶ 100} There is no evidence in the record that appellant attempted to present evidence pertaining to the offense of negligent homicide, but was prohibited from doing so. Rather, the record reflects that appellant presented evidence about the defense's theory that the shooting was an accident. As noted above, a party is generally prohibited from raising an argument for the first time on appeal that was not raised below. *See Wintermeyer*, Slip Opinion No. 2019-Ohio-5156, at ¶ 10.

{¶ 101} Finally, as noted above, had defense counsel presented evidence pertaining to the offense negligent homicide, this evidence would have been inconsistent with the defense's theory that the shooting was accidental. *See Samuels*, 8th Dist. Cuyahoga No. 52527, 1987 Ohio App. LEXIS 8852; *Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888.

{¶ 102} For all of these reasons, we find no basis upon which to conclude that appellant was denied a fair trial. Appellant's fifth assignment of error is overruled

### D. Ineffective Assistance of Counsel

{¶ 103} In his first and sixth assignments of error, appellant argues that he was denied his constitutional right to the effective assistance of counsel.

{¶ 104} In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) counsel's errors prejudiced the defendant, i.e., a reasonable probability that but

for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

## 1. Negligent Homicide Instruction

{¶ 105} In his first assignment of error, appellant argues that counsel provided ineffective assistance by failing to request a jury instruction on the offense of negligent homicide. Appellant concedes that "trial counsel initially sought a jury instruction for negligent homicide." Appellant's brief at 16-17. However, after an off-the-record discussion between defense counsel, the prosecution, and the trial court, defense counsel withdrew his request for a negligent homicide instruction based on the discussion and his apparent belief that he could either request an instruction on accident or negligent homicide — not both. (Tr. 1712.) Appellant argues that counsel's determination that he could only have one instruction or the other, not both, was wrong, and as a result, his performance was deficient.

{¶ 106} As an initial matter, appellant fails to identify any authority in support of his assertion that counsel erroneously believed that he could not have an instruction on accident and the offense of negligent homicide. As noted above, the defense of accident is totally inconsistent with a jury instruction on negligent homicide. *See Samuels*; *Poole*; *see also State v. Gay*, 11th Dist. Portage No. 88-P-2043, 1990 Ohio App. LEXIS 4806, 9-10 (Nov. 2, 1990), citing *State v. Hill*, 31 Ohio App.3d 65, 508 N.E.2d 1038 (1st Dist.1987). ("[N]o instruction on negligent

homicide is required when the theory of the defense is predicated on an accident.")

In *Hill*, the First District explained that because the defendant argued from the outset that the shooting was accidental, a jury instruction on negligent homicide would not be appropriate. *Id.* at 67.

{¶ 107} In the instant matter, the record reflects that after reviewing all of the evidence and the testimony presented at trial, defense counsel made the strategic, tactical decision to pursue the theory of accident to reduce appellant's criminal culpability rather than pursuing the theory of negligent homicide. *See State v. Taylor*, 5th Dist. Richland No. 2005-CA-0112, 2006-Ohio-4064, ¶ 41. The decision about which defense or theory to pursue at trial is a matter of trial strategy "within the exclusive province of defense counsel to make after consultation with his [or her] client." *State v. Murphy*, 91 Ohio St.3d 516, 524, 747 N.E.2d 765 (2001).

{¶ 108} A defendant is not denied the constitutional right to effective assistance of counsel if counsel makes the strategic decision to not pursue *every* possible trial strategy. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). Absent a showing that counsel failed to research the facts or the law, or that counsel disregarded a crucial defense, this court defers to counsel's judgment. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980), citing *People v. Miller*, 7 Cal.3d 562, 573-574, 102 Cal.Rptr. 841, 498 P.2d 1089 (1972).

{¶ 109} In this case, the record reflects that defense counsel considered the theory of negligent homicide and raised the issue of a negligence instruction.

However, defense counsel ultimately decided to pursue the theory of accident rather than the theory that appellant acted negligently.

{¶ 110} The Ohio Supreme Court has explained that reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable." *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *see also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95 ("[D]ebatable trial tactics do not constitute ineffective assistance of trial counsel."). The Ohio Supreme Court has declined to second-guess a strategic decision made by trial counsel even when appellate counsel argues that he or she would have defended against the charges differently. *State v. Post*, 32 Ohio St.3d 380, 388, 513 N.E.2d 754 (1987); *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998).

{¶ 111} After reviewing the record, we decline to second-guess trial counsel's strategical and tactical decision to pursue the defense of accident rather than the theory that appellant committed the offense of negligent homicide. For all of the foregoing reasons, appellant's ineffective assistance claim fails in this regard. Appellant's first assignment of error is overruled.

## 2. Widow

{¶ 112} In his sixth assignment of error, appellant argues that counsel's performance was deficient during pretrial proceedings because counsel failed to conduct a reasonable investigation and failed to interview the widow before trial. Furthermore, appellant argues that counsel's performance during trial was deficient

because counsel asked the widow a question during trial to which counsel did not know the answer, and in doing so, elicited testimony at trial that "directly contradicted [the] theory of defense." Appellant's brief at 32. As noted above, the defense's theory of the case was that appellant's gun discharged accidentally.

{¶ 113} Defense counsel asked the widow whether she had a hair appointment on the day of or shortly after the shooting. The state objected, and the trial court called the parties to sidebar. During sidebar, the state argued that the testimony was irrelevant. In response, defense counsel explained, "[w]ell, the relevance is [the widow said she] had a hair appointment that day and she cancelled it and said her husband was accidentally shot and I want to see if she actually said that." (Tr. 969.) The prosecutor asked defense counsel who the widow made the statement to, and defense counsel asserted that he wanted to find that out. "[The widow] had a hair appointment and it became recent knowledge to me that she cancelled it. She called and said, [m]y husband was accidentally shot. I want to see if she said — I meant to see if it comes from her mouth." (Tr. 969.)

{¶ 114} On the day of the shooting, the widow asked appellant what had happened. Appellant asserted that the shooting was an accident. This testimony was elicited by the state. Defense counsel sought to ask the widow whether she believed appellant.

{¶ 115} The trial court explained that whether or not to believe appellant's assertion is for the jury, not for the widow to testify about. The court asked the defense attorneys whether they knew the answer to the question (did the widow

believe appellant's assertion that the shooting was an accident?). Both attorneys confirmed that they did not. (Tr. 973.)

{¶ 116} Following the sidebar, the following exchange took place between defense counsel and the widow:

[Defense Counsel]: Okay. Have you ever told anybody that this was an accident?

* * *

[Defense Counsel]: I said, Your Honor, has [widow] ever relayed to anybody that this was an accident.

[Widow]: Have I ever said that it was an accident? I don't believe so.

(Tr. 975-976.)

{¶ 117} After reviewing the record, we find that appellant's ineffective assistance claim regarding defense counsel's question to the widow fails under the second *Strickland* prong. Assuming, arguendo, that counsel's failure to interview the widow and the question with which appellant takes issue constitutes deficient performance, appellant cannot demonstrate a reasonable probability that but for counsel's question, the result at trial would have been different. Even if the widow had testified that she had, in fact, communicated to people after the shooting that the victim was shot accidentally, this does not constitute a reasonable probability that the outcome at trial would have been different. Finally, the record reflects that counsel had *recently* learned about the widow's purported statement — asserting that her husband had been accidentally shot in cancelling her hair appointment. Although counsel did not know the answer to the question with which appellant

takes issue, counsel made a strategical, tactical decision to ask the question, which could have supported the defense's theory of an accidental shooting.

{¶ 118} Finally, we note that this was a jury trial that spanned eight days during which 16 different witnesses testified. We decline to second guess counsel's strategic decision to ask the single question with which appellant takes issues. An affirmative answer to the question would have supported the defense's theory that the shooting was accidental, and a negative answer to the question was of little to no consequence in determining whether appellant recklessly caused the death of the victim.

{¶ 119} Because appellant has failed to demonstrate prejudice or a reasonable probability that the outcome at trial would have been different but for defense counsel's question, appellant's ineffective assistance claim fails in this regard. Appellant's sixth assignment of error is overruled.

## III. Conclusion

{¶ 120} After thoroughly reviewing the record, we overrule appellant's assignments of error and affirm the trial court's judgment. Appellant's conviction for reckless homicide was supported by sufficient evidence and is not against the manifest weight of the evidence. The trial court did not commit plain error in failing to provide a negligent homicide instruction to the jury, and appellant was not denied his right to a fair trial. Appellant was not denied his constitutional right to the effective assistance of counsel.

{¶ 121} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

FRANK D. CELEBREZZE, JR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
EILEEN A. GALLAGHER, J., CONCUR